1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**
9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10

11   GERAWAN FARMING, INC.,                    CASE NO. CV F 10-0148 LJO JLT

12                    Plaintiff,               **SUMMARY JUDGMENT DECISION**
             vs.                               (Docs. 112, 126.)
13   PRIMA BELLA PRODUCE, INC.,

14                    Defendant.
15   _____/

16                          **INTRODUCTION**

17          Defendant Prima Bella Produce, Inc. ("PBP") seeks summary judgment on plaintiff Gerawan

18   Farming, Inc.'s ("Gerawan's") federal and common law trademark infringement, dilution and unfair

19   competition claims.  Gerawan contends material factual disputes exist on all grounds upon which PBP

20   seeks summary judgment, in particular, whether there is a likelihood of confusion among PBP's and

21   Gerawan's trademarks.  This Court considered PBP's summary judgment motion on the record without

22   a hearing, pursuant to Local Rule 230(g).[1]  For the reasons discussed below, this Court DENIES PBP

23   summary judgment.

24   _____

25          [1]        This Court carefully reviewed and considered the extensive record, including all evidence, arguments,
     points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other
26   papers filed by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be
     construed to the effect that this Court did not consider the evidence, argument, document, objection or paper.  This Court
27   thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary
     judgment.  This Court does not rule on objections in a summary judgment context, unless otherwise noted.
28

                                            1

# BACKGROUND

## Summary

This is a dispute over Gerawan's use of its "Prima" trademarks and PBP's use of its "Prima Bella" trademarks.

Family owned and operated since 1938, Gerawan is based in Sanger, California and describes itself as "the nation's largest grower of peaches, plums and nectarines and among the leaders in table grapes." Gerawan sells its produce in grocery and warehouse stores, fruit and vegetable stands, and similar retail outlets, and its customers include Costco, Safeway and Wal-Mart. Gerawan owns 10 registered U.S. trademarks and claims to have used its Prima trademarks as a brand for its fresh produce in interstate commerce since early 1970.

PBP is based in Tracy, California and describes itself as a "leading supplier" of "fresh, year round sweet corn" in the United States and "the largest packaged sweet corn producer and seller in the Western United States." PBP packages and sells fresh sweet corn that is distributed to retail outlets, including Costco, Safeway and Wal-Mart, as well as food service companies.[2] PBP's recent retail sales are in the millions of dollars. PBP uses Prima Bella trademarks.

Gerawan claims that PBP has infringed upon and diluted Gerawan's Prima trademarks. In this action, Gerwan seeks to enjoin PBP's infringement and dilution of Gerawan's Prima trademarks and to recover damages for PBP's alleged infringement, dilution and unfair trade practices. PBP seeks summary judgment in the absence of evidence of a likelihood of confusion between Gerawan's and PBP's trademarks and dilution caused by PBP's trademarks.

## Gerawan's Trademarks

Gerawan owns U.S. Trademark Reg. No. 1,441,378 for Prima in standard character form ("Prima word mark"). On April 1, 1985, Gerawan applied to register the Prima word mark for "fresh fruits and vegetables, namely, table grapes; peaches; plums; nectarines; lettuce; cauliflower; kiwis; persimmons; rapini; broccoli; bok choy; apricots; cantaloupe; escarole; honeydew; crenshaw; red leaf; green leaf; boston; red cabbage; green cabbage; and nappa." The U.S. Patent and Trademark Office ("USPTO")

---

[2] Gerawan notes that it and PBP share no less than 17 customers.

1   issued a registration for the Prima word mark on June 2, 1987.

2       In November 2007, Gerawan submitted a Combined Declaration of Use in Commerce and

3   Application for Renewal of Registration of Mark under Sections 8 and 9 (15 U.S.C. §§ 1058, 1059) to

4   renew registration for the Prima work mark.

5       Gerawan owns U.S. Trademark Reg. No. 3,592,505 for Prima in a stylized form ("Prima logo").

6   On November 28, 2007, Gerawan applied to register the Prima logo for "fresh fruit."  The USPTO

7   issued a registration for the Prima logo on March 17, 2009.

8       Gerawan also owns eight other trademarks containing "Prima" for its other goods and services,

9   including pallets and computer services.[3]

10                              **PBP's Trademarks**

11      PBP owns U.S. Trademark Reg. No. 3,404,125 for Prima Bella in standard character form

12  ("Prima Bella work mark").  On October 3, 2006, PBP applied to register the Prima Bella work mark

13  for "fresh vegetables."  The USPTO issued registration for the Prima Bella word mark on April 1, 2008.

14      PBP owns U.S. Trademark Reg. No. 3,404,126 for Prima Bella in stylized form ("Prima Bella

15  logo").  On October 4, 2007, PBP applied to register the Prima Bella logo for "fresh vegetables."  The

16  USPTO issued registration for the Prima Bella logo on April 1, 2008.[4]

17      On November 4, 2003, PBP applied to register Glori Ann in standard character form ("Glori Ann

18  word mark") for "fresh vegetables."[5]  On December 21, 2004, the USPTO issued U.S. Trademark Reg.

19  No. 2,913,100 for the Glori Ann word mark.

20                        **Gerawan's History And Naming**

21      Gerawan's principals include Ray Gerawan and his sons Dan and Mike Gerawan.  Gerawan dates

22

23      [3]     This Court will refer to the Prima word mark, the Prima logo and other Gerawan trademarks collectively
        as the "Prima trademarks."

24

25      [4]     PBP claims it is the first "to use the Prima Bella mark in commerce for the 'fresh vegetable' category of
        fresh food produce."  PBP notes that the USPTO trademark examiner searched all trademarks that included the word "Prima"
26      and that although such search would have alerted the trademark examiner to Gerawan's Prima trademark registrations, the
        examiner did not mention Gerawan's Prima trademark in connection with granting PBP exclusive right to use a Prima Bella
27      trademark for "fresh vegetables."

28      [5]     The Prima Bella work mark, Prima Bella logo and Glori Ann word mark will be referred to collectively
        as the "Prima Bella trademarks."

1  back to 1938, when Ray Gerawan's parents began farming in California.

2      In the 1960s, Ray Gerawan came up with the brand name "Prima."  In his deposition, Ray

3  Gerawan testified that he was "[l]ooking for something simple, two syllables, sounded good, it looked

4  good."  Ray Gerawan came up with Prima by himself.

5                    **PBP's History, Naming And Products**

6      PBP's president is Mark Bacchetti ("Mr. Bacchetti"), and its secretary/treasurer is Mary Bacchetti

7  ("Ms. Bacchetti"), Mr. Bacchetti's wife.  PBP is closely held.  A related company, Bella Mia

8  Management, performs PBP's payroll services.

9      Mr. Bacchetti's parents Bert and Gloria Ann Bacchetti engaged in California farming operations.

10 Bert Bacchetti Farms began as a dairy and farming business in the 1950s and incorporated in 1968.  Mr.

11 Bacchetti joined his father as a full-time employee of Bert Bacchetti Farms in 1976.

12     Before PBP began doing business in 2002, Mr. and Ms. Bacchetti formed and operated Marca

13 Bella Farms along with Mr. Bacchetti's father.  Marca Bella Farms began farming and packing

14 operations in 1996.  PBP notes that Marca Bella Farms was primarily devoted to growing and

15 distribution of asparagus and sold asparagus using a Bella trademark.

16     Mr. Bacchetti first began growing and distributing fresh sweet corn as a small part of Marca

17 Bella Farms' operations.  Marca Bella Farms ceased growing and distributing corn products in the early

18 to mid-2000s.

19     In 2001, Ms. Bacchetti came up with the name Prima Bella Produce for the company, PBP, that

20 she and Mr. Bacchetti wanted to form to grow and sell packaged fresh sweet corn.  Ms. Bacchetti desired

21 to include "Bella" to carry on the lineage of related companies.  In her deposition, Ms. Bacchetti testified

22 that to create the Prima Bella Produce name, "I pulled out an Italian dictionary and I came up with words

23 in English that I thought, you know, represented what we were doing and then I would look it up in the

24 Italian version. . . . I wanted names that – that flowed right off the tip of your tongue."  Ms. Bacchetti

25 found "Prima" and believed that it sounded good as "Prima Bella."  Ms. Bacchetti consulted an outside

26 accountant who informed her that "Prima Bella" was not used as a California corporate name.  Mr. and

27 Ms. Bacchetti decided to adopt Prima Bella as the tradename for PBP.  Mr. and Mrs. Bacchetti have no

28 knowledge of a trademark search for Prima Bella prior to PBP's use of it.  Mr. Bacchetti testified that

4

1    he considers Prima Bella as PBP's brand.

2         Prior to PBP's formation, Marca Bella Farms used the Glori Ann word mark for sales of

3    packaged fresh sweet corn products.  With Marca Bella Farms' cessation of growing and distributing

4    sweet corn,  only PBP sells sweet corn using the Glori Ann word mark.

5         When PBP applied to register the Glori Ann word mark in November 2003, PBP included a

6    declaration from Gloria Ann Bacchetti, Mr. Bacchetti's mother, since the trademark is based on her

7    name.  PBP notes that trademark registration rules require such declaration when a trademark is based

8    on a family name of a living person.

9         In some retail outlets, PBP's packaged sweet corn is sold in refrigerated sections known as a "wet

10   rack."  Grocery stores place PBP's fresh sweet corn products in the wet rack next to loose corn.  PBP

11   prefers placement of its packaged sweet corn in upper sections of the wet rack to keep sprinklers off the

12   sweet corn products and to present at consumers' eye level.

13                               **Gerawan's Products And Patents**

14        During recent years, Gerawan's production and sales have been limited to stone fruit[6] and grapes.

15   Dan Gerawan testified that Gerawan and its entities have "been out of vegetables . . . [p]robably 30 years

16   even."  Gerawan's website and promotional materials do not mention Gerawan's farming or sales of

17   vegetable produce.  Produced Gerawan records disclose production and sale of stone fruit and table

18   grapes since 1980, but no vegetable sales.

19        In May 1993, Dan Gerawan signed a Combined Affidavit Under Sections 8 and 15 in which he

20   states that the Prima mark "has been in continuous use in interstate commerce for five consecutive years

21   from the date of registration or the date of publication under Section 12(c) to present, on each of the

22   following goods stated in the registration fresh fruits and vegetables, namely, table grapes; peaches;

23   plums; nectarines; lettuce; cauliflower; kiwis; persimmons; rapini; broccoli; bok choy; apricots;

24   cantaloupe; escarole; honeydew; crenshaw; red leaf; green leaf; boston; red cabbage; green cabbage; and

25   nappa."  In his deposition, Dan Gerawan acknowledged that the affidavit was incorrect with respect to

26   vegetables.

27

28        [6]      Stone fruit includes peaches, plums, nectarines and apricots.

In November 2007, Gerawan submitted a Combined Declaration of Use in Commerce and Application for Renewal of Mark under Sections 8 and 9 (15 U.S.C. §§ 1058 & 1059) to request deletion from the registration of all vegetable produce and certain fruit produce.  In February 2009, Gerawan's trademark counsel authorized the USPTO to amend the Prima logo to delete "and vegetables."  In connection with the Prima logo's statement of use, Gerawan informed the USPTO that the "applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) photograph of a container of goods."  The specimen provided was a box with the "Prima Gattie" peach variety designation and the Prima logo.  PBP notes that federal regulations require inclusion of the applicable fruit variety name on fruit packages and containers.

Mike Gerawan is the named inventor of five plant patents with "Prima" titles which were applied for Gerawan's benefit.  The titles are:

1.    U.S. Plant Patent No. 8068 – "Prima Black Plum 8-15" – term expired on December 24, 2010;

2.    U.S. Plant Patent No. 8067 – "Prima Black Plum 5-25" – term expired on December 24, 2010;

3.    U.S. Plant Patent No. 8057 – "Prima Red Plum 9-1" – term expired on December 24, 2010;

4.    U.S. Plant Patent No. 10,085 – "Prima Gattie Peach Tree" – term expires on January 24, 2016; and

5.    U.S. Plant Patent No. 12,011 – "Nectarine Tree Named 'Prima Diamond 19'" – term expires on March 5, 2019.[7]

PBP notes that each of these patents begins with a description that the "invention relates to a new and distinct variety" of the subject fruit tree that produces a corresponding fruit.  Gerawan points out that the Prima word mark and Prima logo predate by 18 years any of the above patents.  Gerawan notes that fruit producers commonly associate their trademarks with patent varieties and identify the trademarks in their plant patents.

---

[7]    Mike Gerawan is also the inventor of seven U.S. plant patents for fruit trees and plants which do not include "Prima" in their titles.

6

1    Gerawan markets and sells its produce, including 20 kinds of peaches and table grapes, under

2    Prima marks "in various forms," and expanded its products to pallets and computer services.  Gerawan

3    explains that Prima is used for all Gerawan fruit, not just fruit produced from plum, nectarine and peach

4    trees covered by the five Prima patents.

5    PBP notes that the "Prima" plum patent titles are included in the *Brooks and Olmo Register of*

6    *Fruit and Nut Varieties* (3rd ed. 1997), which USPTO examiners review to determine if any other patent

7    includes a variety name.  PBP further notes that after the 1997 third edition of the *Brooks and Olmo*

8    *Register of Fruit and Nut Varieties*, subsequent listings of patented varieties of "Prima" nectarines and

9    peaches are included in the "Register of New Fruit and Nut Varieties" published in the journal

10   *Horticultural Science*.  PBP points out that since 1994, "Prima" peach and nectarine varieties have been

11   listed in the Federal Register and the Code of Federal Regulations as fruit varieties and that successive

12   Federal Registrar editions include numerous references to Prima varieties of peaches and nectarines.

13   According to PBP, unlike other California peach and nectarine growers, since 2004, Gerawan has not

14   appended trademark symbols to the "Prima" peach and nectarine varieties listed in the Federal Register

15   although Gerawan's fruit variety designations in the Federal Register and Code of Federal Regulations

16   are amended from time to time.

17   Gerawan points out that the USPTO in granting six Gerawan trademark registrations for Prima

18   produce has not taken the position the Prima is a varietal name for live plants, seeds, or fruit. Dan

19   Gerawan denies that Gerawan's varieties appeared in the Federal Register.

20   **Gerawan's Advertising And Promotion**

21   Ray Gerawan testified that Gerawan's products are its advertisement "to a point."  Ray Gerawan

22   further testified: "Prima's a brand, that's how we sell our fruit, Prima. . . . We do numerous promotions

23   with retailers, promoting ads of Prima to the consumer."

24   Ray Gerawan testified that Gerawan advertising in the 1960s and 1970s comprised "[j]ust

25   primary, the brand. . . . Putting the brand on the product."  PBP notes that in the 1980s, Gerawan

26   distributed promotional material to wholesale customers and that the "Gerawan" family name is included

27   in large font.

28   Gerawan has not engaged in significant television and radio advertising.  In 2007 or 2008,

1    Gerawan prepared a radio spot for a grocery store customer.  Gerawan's sales manager does not know

2    if the spot aired.  In 2009, Gerawan had one direct mail piece sent to wholesale and retail customers for

3    Thompson seedless grapes.  Gerawan notes that it runs advertisements in trade publications and

4    magazines and advertises with point-of-sale signage.

5         Point-of-sale posters have included phrases "Prima Fruit, Prima Flavor," "Prime Grapes, Prima

6    Sweet Goodness," and "Prima – Fruit in its Prime."  PBP notes that a Gerawan-produced photo depicts

7    use of a "Prime Fruit, Prima Flavor" point-of-sale display and shows the retailer's price signs which refer

8    to Gerawan's peaches and nectarines as "California Peaches" and "California Nectarines."

9         PBP points out that Gerawan has not promoted Prima trademarks by using billboards, airport or

10   bus ads, celebrity chefs, cookoffs, cookbooks, sweepstakes, clubs, running races, walkathons, or state

11   and county fairs.  Gerawan print promotions include point-of-sale materials and brochures.

12        Gerawan retained MJR Creative Group to prepare Gerawan's point-of-sale and other advertising

13   materials.  In years during 2002-2010, Gerawan has paid MJR well under $81,000 annually but did pay

14   nearly $198,000 one year.  PBP notes the absence of produced records of Gerawan's television and radio

15   advertising and number and text of advertisements.

16        Gerawan considers its website as a form of advertising.  The website lists Gerawan's products

17   with the Prima trademarks.  PBP notes that Gerawan's website refers to its stone fruit and table grapes

18   as fruit "varieties" ("Standard Varieties Aren't Good Enough.  So We Develop Our Own.") PBP notes

19   that Gerawan's website identifies "Prima Red Seedless" and "Prima Black Seedless" as grape varieties,

20   "Primacot" as an apricot variety, "Red" and "Black" as plum varieties," and "Prima Gattie" as a peach

21   variety.  Gerawan promotes its patented varieties of peaches and nectarines in print, website advertising,

22   and letters to grocery store buyers.

23        Gerawan's shipping cartons function as displays of the Prima trademarks, and PBP notes that

24   they identify fruit by variety name. Gerawan points out that it uses its Prima trademarks on its boxes,

25   buildings, website, labels, tags, recipe cards, pallets, clothing, headwear, pens, beverage containers,

26   computer bags, paper tablet holder for sales and marketing, air pillows for shipping, fruit stickers,

27   posters, business cards, <prima.com> email address, large retail store banners, letterhead, brochures,

28   tissue paper, packing top sheets, trays, print advertisements, pallets and computer services.

1   Retailers offer contests with Prima products between their stores.  General Mills approached

2   Gerawan for a cross promotion of Bisquick and Prima peaches.

3   **Recognition Of Prima And Its Brand**

4   Randy Scott ("Mr. Scott") is a fruit category manager for Food Lion, a North Carolina regional

5   grocery with 1200 stores in 11 states with 10 million customers.  When asked of his understanding of

6   the use of "Prima," Mr. Scott testified: "Prima is on the side of their boxes.  It's on the side of their

7   boxes, on their stickers and it's – some of their varieties are called Prima with a number and some of

8   them with a name."  In his deposition, Mr. Scott also denied that he was aware that Prima was a variety.

9   In his declaration, Mr. Scott claims that several customers have asked for "Prima produce grown by the

10   Gerawan name."

11   Jason Weiler ("Mr. Weiler") is a head fruit buyer for one of Gerwan's New York wholesalers.

12   In his deposition, Mr. Weiler reviewed a table grapes label on the end of display boxes and testified:

13   Q.   I'm showing you what's been marked as Exhibit 91.  Have you ever seen a label
     like that for Gerawan Farming?

14

15   A.   Yes.

     Q.   . . . is this on the end of boxes?

16

     A.   Yes.

17

     Q.   . . . you see the portion of Exhibit 91 that has table grapes?

18

     A.   Yes.

19

     Q.   And there's some boxes below that?

20

     A.   Yes.

21

     Q.   . . . to your understanding, are the boxes below that?  Are those check-off boxes?

22

     A.   They'll check off the variety of grape that's actually in the box.

23

     Q.   . . . So if there was a check off near Prima Black Seedless, that would be the
     variety of grape that was in the box?

24

     . . .

25

     A.   Yes.

26

27   Mr. Weiler further testified that Prima is a Gerawan brand and a major brand in the produce industry.

28   Mr. Weiler testified that his customers ask "for the Prima brand of that commodity, grape, peach,

9

1  nectarine" and identified several customers who asked for the Prima brand.  PBP notes that Mr. Weiler

2  works for "a wholesaler in a terminal market that sells to retail grocery store representatives, not end

3  customers."

4      When asked to give examples of varieties, Mr. Scott responded: "Naval oranges, Mineola

5  tangelos, caracara oranges, blood oranges" and not the company from which an orange comes.

6      When asked to identify fruit brands which Food Lion sells, Mr. Scott testified:

7      I don't know we offer brands so much as we buy from companies that have a brand on
       it.  We don't really sell produce as branded. . . . we're selling the commodities, so if
8      we're buying from Sunkist, obviously that's their brand.  We offer that, but we don't
       advertise or sell that as branded product.  We're basically buying top quality produce.
9

10     Q.    But as part of that, there are certain fruits that are associated with brands?

11     A.    I believe they're recognized as having a brand, yes.

12     Q.    Using that definition, what fruits does Food Lion sell that are associated with a
             brand?
13
14     A.    I would say the ones such as Chiquita bananas, Del Monte pineapples, Dole
             bananas, Dole salads, Fress Express salads, those are ones that . . . have a brand
15           name on them, and . . . I believe they're probably recognizable.

16     Q.    Does Prima fall into that category?

17     A.    Not in my opinion.

18     Q.    And why is that?

19     A.    I think I could show that fruit to someone with that label on it and I think that
             wouldn't mean anything to anybody on the east coast.
20
       Q.    So what is your definition of a brand?
21
       A.    A brand to me is something nationally recognized.
22
             . . .
23
       Q.    But if a customer picks up a piece of fruit that's of high quality, how do they
24           know to ask for that particular type of fruit again in the future?

25     A.    I've never – pretty sure I haven't had a customer ask for a particular brand of
             fruit.  They have asked for when am I going to get really good honey crisp apples.
26           When am I going to get big, juicy bright red grapes?  When am I going to get
             some nicer size bright red strawberries?  Very rare to ask for a brand.  And part
27           of that's because we carry multiple – we carry products from multiple sources.

28     Ray Gerawan testified that he considered Prima a famous fruit brand: "Prima's a brand, it's like

10

1  Del Monte or Dole or Driscoll, it's a brand. That's all it is." Ray Gerawan identified Sunkist, Dole, Del

2  Monte and Driscoll Berries well recognized brands by the consuming public. Ray Gerawan testified that

3  he does not know whether the Prima brand is widely recognized by the general consuming public in

4  California or any area of it. Ray Gerawan does not know of testing whether the Prima brand is widely

5  recognized in a particular geographic area. Ray Gerawan is unaware of informal polls to determine if

6  consumers recognize the Prima brand.[8]

### Fruits And Vegetables Promotion

8      PBP notes that at the grocery store level, fruits and vegetables generally are not displayed

9  together. PBP points to Mr. Scott's deposition testimony that Food Lion generally does not mix fruits

10  and vegetables in a single display and generally does not advertise fruits and vegetables side by side in

11  outdoor signage. Mr. Scott testified that corn is not sold side by side with peaches, plums, nectarines

12  or grapes but rather is sold within 20 feet of such fruits.

13      PBP further notes that at the grocery store level, fruits and vegetables are neither considered

14  complementary nor promoted together. PBP points to Mr. Scott's testimony that Food Lion does not

15  promote fruits and vegetables together as a tie in. Gerawan points to Mr. Scott's declaration that fruits

16  and vegetables "are commonly and frequently considered together in the produce industry." Mr.

17  Bacchetti testified that fruits and vegetables are displayed together at produce trade shows.

### Public Domain And Commercial Use Of "Prima"

19      Citing to Webster's dictionary, PBP explains that "prima" means "first or leading" in English

20  and is derived from the feminine conjugation of the Italian word primo, which in turn is derived from

21  the Latin word primus – more at prime. Gerawan takes the position that prima's English translation is

22  "before." Gerawan notes that the Italian or Spanish word "bella" translates to "beautiful" in English.

23      PBP notes that Google search results for plums, peaches, nectarines, apricots and table grapes

24  did not mention Gerawan or its Prima fruit produce on the first page. PBP further notes that Bing search

25  results for stone fruit and table grapes did not mention Gerawan or its Prima fruit produce in the first five

26  pages. According to PBP, a Bing search of "prima plum" did not mention Gerawan in the first five

27

28  [8]      Gerawan takes issue with this testimony of Ray Gerawan in that he was not designated as Gerawan's
F.R.Civ.P. 30(b)(6) witness as to fame and secondary meaning of the Prima trademarks.

1   pages but did produce a search result for Prima red and black plum patents.

2       Gerawan notes that PBP did not search for Gerawan's products in connection with its Prima

3   brand, that is, "prima peaches," "prima stone fruit," or "prima grapes," "which identifies Gerawan's

4   Prima brand as the first hit."

5       PBP further points out that numerous U.S. companies have incorporated Prima into their

6   corporate or business tradenames, including 209 California corporate entities and 55 limited liability

7   entities.  PBP's search of USPTO's database in early April 2011 revealed 779 records of live or dead

8   trademark registrations or applications which include "Prima."  PBP notes that the USPTO has granted

9   trademark registrations which include "Prima" as all or part of a trademark for numerous agricultural

10  and food-related entities and include Prima (beer), Prima (wine), Prima Frutta (fresh fruit and fresh

11  vegetable produce), Prima Roma (tomato produce), Prima Guida (pizza ingredients), Prima Taste

12  (restaurant services and food ingredients), Yerba Prima (herbal dietary supplements), and Prima Cucina

13  (cookware).

14      PBP further notes that a third-party has held a Prima Frutta trademark for fresh fruits and

15  vegetables since 1989 and of which Gerawan has been aware.  PBP points to Dan Gerawan's testimony

16  that he easily distinguished the Prima and Prima Frutta logos in a photograph of an in-store promotion

17  of Prima Frutta apples displayed closely to Gerawan's peaches.

18                              **Consumer Confusion**

19      PBP contends that Gerawan lacks evidence of "actual consumer confusion" caused by PBP's use

20  of its Prima Bella trademarks.  PBP notes that Gerawan has produced no trademark surveys to

21  demonstrate likelihood of confusion, secondary meaning, fame or actual dilution associated with

22  Gerawan's Prima trademarks and that Gerawan does not conduct market surveys in its regular business

23  course.

24      According to PBP, the produce industry does not consider PBP's Prima Bella trademarks to be

25  similar to Gerawan's Prima trademarks.  PBP offers the declarations of R.S. Viggers ("Mr. Viggers"),

26  general manager of Charlie's Produce, a full-service produce supplier, and Eugene Razo ("Mr. Razo"),

27  who works in sales for Interfresh, a nationwide produce distributor and marketer.  Both Mr. Viggers and

28  Mr. Razo declare: "I am not aware of any producers of fresh fruit that use a trademark that I would

12

1    consider similar to Prima Bella or Gloriann."

2        Gerawan seeks to strike Mr. Viggers' and Mr. Razo's declarations in that PBP failed to disclose

3    Mr. Viggers and Mr. Razo as witnesses until May 5, 2011, a day prior to the May 6, 2011 discovery cut-

4    off.   Gerawan contends that they have been denied ability to depose Mr. Viggers and Mr. Razo,

5    especially since PBP cancelled the deposition of Charlie's Produce, of which PBP belatedly provided

6    notice.[9]   This Court will not tolerate untimely witness disclosures and discovery gamesmanship and

7    STRIKES Mr. Viggers' and Mr. Razo's declarations.   F.R.Civ.P. 37(b)(2)(A)(ii) and (c)(1)(C).

8        As to confusion, Gerawan points to the declaration of Food Lion's Mr. Scott: "The first time I

9    heard of Prima Bella Produce in connection with produce, I immediately thought of Gerawan's Prima

10   produce and wondered if the two were related in some manner."

11                                   **Gerawan's Claims**

12       Gerawan proceeds on its First Amended Complaint for Trademark Infringement, Trademark

13   Dilution, Trademark Cancellation, and Unfair Competition ("FAC") to recover damages and injunctive

14   relief for PBP's alleged infringement and dilution of Gerawan's Prima trademarks and PBP's unfair

15   trade practices. The FAC alleges that Gerawan's Prima trademarks have "become a valuable asset

16   symbolizing Gerawan, its quality products and goodwill."  The FAC accuses PBP to possess no less than

17   constructive knowledge of Gerawan's Prima trademarks and to have adopted "the confusingly similar

18   designation Prima Bella which is identical or nearly identical to Gerawan's common law and federally

19   registered Prima marks."   The FAC alleges that the "likelihood of confusion and dilution between

20   Gerawan's common law and federally registered Prima marks and Defendant's designation Prima Bella

21   is not alleviated by the descriptive word "bella" in Defendant's designation."   The FAC further accuses

22   PBP of adopting the its Prima Bella designation to trade on "the goodwill associated with Gerawan's

23   marks, and, to obtain salability for Defendant's fresh produce products that it otherwise would not have."

24       The FAC alleges:

25   1.    A (first) infringement of federally registered trademark claim under 15 U.S.C. § 1114

26          that PBP's unauthorized use of the federally registered Prima Bella trademarks is likely

27

28          [9]     During the late afternoon of April 29, 2011, Gerawan received PBP's deposition notice and subpoena for
     Charlie's Produce for a May 6, 2011 deposition.  On May 4, 2011, PBP cancelled the deposition.

                                         13

to confuse the purchasing public;

2.    A (second) common law trademark infringement claim that PBP's unauthorized use of the Prima Bella designation is likely to confuse the purchasing public to constitute infringement of Gerawan's common law rights;

3.    A (third) dilution of federally registered trademark claim that PBP's use of Prima Bella trademarks is likely to dilute and impair the distinctiveness of Gerawan's famous trademarks and to create false association to harm the reputation of Gerawan's famous Prima trademarks;

4.    A (fourth) unfair competition and false designation of origin claim that PBP's conduct is likely to cause confusion, mistake and deception to constitute a false designation of origin to violate 15 U.S.C. § 1125(a);

5.    A (fifth) unfair competition and unfair business practices claim that PBP's unlawful conduct constitutes unfair competition under the common law and California Business & Code, §§ 17000, et seq, and 17200, et seq.; and

6.    A (sixth) cancellation of federally registered trademark claim to cancel the Prima Bella trademarks because they are likely to cause confusion and mistake with the purchasing public.

For remedies, the FAC seeks an accounting of PBP profits from its unlawful activities, an injunction to prevent PBP's use of Prima Bella, compensatory, treble and punitive damages, and cancellation of the Prima Bella work mark and Prima Bella logo.

Gerawan pursues a counterclaims, not at issue here, to cancel registrations of the Prima word mark and Prima logo as generic and/or abandoned.

## DISCUSSION

### Summary Judgment Standards

PBP seeks summary judgment in the absence of evidence of likelihood of confusion between Gerawan's Prima trademarks and PBP's Prima Bella trademarks and to meet the high threshold to establish the Prima trademarks' fame.  PBP contends that in the absence of likelihood of confusion and dilution, all of Gerawan's claims fail. *See Brookfield Communications, Inc. v. West Coast Entertainment*

1    *Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999) ("To establish a trademark infringement claim under section

2    32 of the Lanham Act or an unfair competition claim under section 43(a) of the Lanham Act, [plaintiff]

3    must establish that [defendant] is using a mark confusingly similar to a valid, protectable trademark of

4    [plaintiff's]."  PBP continues that summary judgment on Gerawan's federal trademark claims warrants

5    summary judgment on Gerawan's California claims.  *See Cleary v. New Corp.*, 30 F.3d 1255, 1261-1262

6    (9th Cir. 1994) ("state common law claims and actions pursuant to California Business and Professions

7    Code § 17200 are 'substantially congruent' to claims under the Lanham Act"); *Walter v. Mattel, Inc.*,

8    210 F.3d 1108, 1111 (9th Cir. 2000) (federal, common law and state statutory unfair competition claims

9    are treated "coextensive" in that they "turn on the sufficiency of proof of likelihood of confusion");

10   *Metro Pub., Ltd. v. San Jose Mercury News, Inc.*, 861 F.Supp. 870, 881 (N.D. Cal. 1994) ("Because the

11   Court grants summary judgment in favor of the Mercury News on Metro Publishing's trademark

12   infringement and dilution claims, it also grants summary judgment in favor of the Mercury News on

13   Metro Publishing's unfair competition claim under California Business & Professions Code § 17200,

14   inasmuch as that claim is based on trademark infringement and dilution.")

15       Gerawan responds that material factual issues defeat summary judgment on all grounds raised

16   by PBP.  Gerawan points out that "trial courts disfavor deciding trademark cases in summary judgments

17   because the ultimate issue is so inherently factual. . . . Additionally, the question of likelihood of

18   confusion is routinely submitted for jury determination as a question of fact." *Levi Strauss & Co. v. Blue

19   Bell, Inc.*, 778 F.2d 1352, 1356, n. 5 (9th Cir. 1985).

20       As the parties well know, F.R.Civ.P. 56(a) permits a party to seek summary judgment

21   "identifying each claim or defense – or the part of each claim or defense – on which summary judgment

22   is sought."  "A district court may dispose of a particular claim or defense by summary judgment when

23   one of the parties is entitled to judgment as a matter of law on that claim or defense." *Beal Bank, SSB

24   v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

25       Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any

26   material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a); *Matsushita

27   Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,

28   Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  "Although disfavored in

15

1  trademark infringement cases, summary judgment may be entered when no genuine issue of material fact

2  exists." *Surfvivor Media, Inc. v. Survivor Productions*, 406 F.3d 625, 630 (9th Cir. 2005).  The purpose

3  of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a

4  genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union*

5  *of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

6       On summary judgment, a court must decide whether there is a "genuine issue as to any material

7  fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey*

8  *v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*,

9  398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82

10  S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir.

11  1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

12  inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for

13  summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106

14  S.Ct. 2505 (1986)

15       The evidence of the party opposing summary judgment is to be believed and all reasonable

16  inferences that may be drawn from the facts before the court must be drawn in favor of the opposing

17  party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The

18  inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or

19  whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-

20  252, 106 S.Ct. 2505.

21       To carry its burden of production on summary judgment, a moving party "must either produce

22  evidence negating an essential element of the nonmoving party's claim or defense or show that the

23  nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of

24  persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th

25  Cir. 2000); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (2007) (moving party is able to

26  prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case");

27  *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).  A

28  "complete failure of proof concerning an essential element of the nonmoving party's case necessarily

16

1    renders all other facts immaterial" to entitle the moving party to summary judgment.  *Celotex Corp. v.*

2    *Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

3         "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the

4    court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102; *see High Tech*

5    *Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.

6    Only disputes over facts that might affect the outcome of the suit under the governing law will properly

7    preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

8         "If a moving party fails to carry its initial burden of production, the nonmoving party has no

9    obligation to produce anything, even if the nonmoving party would have the ultimate burden of

10   persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

11   "If, however, a moving party carries its burden of production, the nonmoving party must produce

12   evidence to support its claim or defense."  *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

13   at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

14   fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see*

15   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

16   of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

17   make the showing sufficient to establish the existence of an element essential to that party's case, and

18   on which that party will bear the burden of proof at trial.")

19        "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

20   the nonmoving party defeats the motion."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

21   106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

22   'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp.*

23   *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

24   289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

25   plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

26        As discussed below, Gerawan has raised material factual issues, especially regarding likelihood

27   of confusion and dilution of the Prima trademarks to defeat summary judgment.

28   / / /

17

**Genericness – Use Of Prima Fruit Variety**

*No Presumption Of Genericness*

PBP argues that the Prima trademarks are associated with a varietal name to render them "automatically generic" and part of the public domain. "Generic marks are not capable of receiving protection because they identify the product, rather than the product's source." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005); *see First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 653-654 (10th Cir. 1996) ("The greater the number of identical or more or less similar marks already in use on different kinds of goods, the less is the likelihood of confusion between any two specific uses of the weak mark.")

PBP contends that application of trademark law to plant variety names applies to likelihood of confusion and dilution issues. PBP quotes from a treatise: "Plant varietal names are generic designations and cannot be registered as trademarks." 3 Callman on Unfair Competition, Trademarks & Monopolies (4th ed. updated 2011), § 18:5. "For decades the U.S. Patent and Trademark Office and case law have treated varietal names as generic designations that do not and can not function as trademarks." *Van Well Nursery, Inc. v. Mony Life Ins. Co.*, 421 F.Supp.2d 1321, 1328 (E.D. WA 2006).

PBP argues that the Prima trademarks are generic because:

1.      Gerawan incorporated Prima into five plant patent titles;

2.      Generic fruit varietal names are stenciled on Gerawan display boxes;

3.      The Federal Register lists Gerawan's fruit by their generic fruit varietal designations;

4.      Gerawan's point-of-sale posters and website identify Gerawan fruit by generic varietal designations; and

5.      Fruit wholesaler and category buyers refer to Gerawan's produce by generic varietal designations.

Gerawan responds that "mere association of a trademark with a varietal name does not forfeit the trademark to the public domain." Gerawan argues that PBP's "genericness" defense "is subject to strict proof," which PBP lacks. Gerawan notes there is a strong presumption that a mark is not generic. "A certificate of registration of a mark . . . shall be prima facie evidence of the validity fo the registered mark . . ." 15 U.S.C. § 1057(b). A "plaintiff alleging infringement of a federally-registered mark is

18

entitled to a presumption that the mark is not generic." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005).  A defendant may overcome the presumption "by showing by a preponderance of evidence that the term was or has become generic." *Anti-Monopoly, Inc. v. General Mills Fun Group, Inc.*, 684 F.2d 1316, 1319 (9th Cir. 1982), *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234 (1983).  "Whether a mark is generic is a question of fact." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 840 (9th Cir. 2001).

The Ninth Circuit Court of Appeals has explained how to address genericness:

> To determine whether a term has become generic, we look to whether consumers understand the word to refer only to a particular producer's goods or whether the consumer understands the word to refer to the goods themselves. . . . If the buyer understands the word to refer to the source of the goods, the term is not generic. However, if the disputed term is identified with all such goods or services, regardless of their suppliers, it is generic.

*KP Permanent Make-Up*, 408 F.3d at 604 (internal quotation marks and citation omitted).

15 U.S.C. § 1064(3) also provides:

> A registered mark shall not be deemed to be the generic name of goods or services solely because such mark is also used as a name of or to identify a unique product or service. The primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used.

Moreover, a mark is deemed "abandoned" "[w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph." 15 U.S.C. § 1127.

### *Plant Patents*

As to genericness of plant patents, PBP points to the Trademark Manual of Examining Procedure, § 1202.12, at 1200-108-109 (7th ed. 2010), which provides in part:

> Varietal or cultivar names are designations given to cultivated varieties or subspecies of live plants or agricultural seeds. They amount to the generic name of the plant or seed by which the variety is known to the public. These names can consist of a numeric or alphanumeric code or can be a "fancy" arbitrary name. The terms "varietal" and "cultivar" may have slight semantic differences but pose indistinguishable issues and are

treated identically for trademark purposes. . . .

> A varietal or cultivar name is used in a plant patent to identify the variety.  Thus, even if the name was originally arbitrary, it "describe[s] to the public the [plant] of a particular sort, not a [plant] from a particular [source]." *Dixie Rose [Nursery v. Coe]*, 131 F.2d 446, 447, 55 U.S.P.Q. 315, 316 (App. D.C. 1942)].  *It is against public policy for any one supplier to retain exclusivity in a patented variety of plant, or the name of a variety, once its patent expires. . . .*

PBP also points to the following from the Trademark Manual of Examining Procedure, § 1202.13: "If the examining attorney determines that the wording to be registered as a mark for live plants, agricultural seeds, fresh fruits, or fresh vegetables comprises a varietal or cultivar name, then the examining attorney must refuse registration, or require a disclaimer, on the ground that the matter is the varietal name or the goods and does not function as a trademark under §§ 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, and 1127."

PBP argues that Gerawan's insertion of "Prima" as a descriptive patent name for its "proprietary" fruit undermines the Prima trademarks "as a source-identifier of its stone fruit and table grape produce." PBP notes that Gerawan included "Prima" on three plum patent applications in 1990, used alphanumerical "7-B" for its next plum patent in 1996, used "Prima Gattie" to name a peach tree patent in 1996, and used "Prima Diamond" for its nectarine patent application in 1999.  PBP points out that grocery store wholesalers and retailers understand and refer to Gerawan's fruit produce by their varietal designations.  PBP concludes that the "Prima" name "is inextricably linked to generic fruit variety designations" and "cannot simultaneously function as Prima trademarks."

Gerawan responds that PBP's reference to section 1202.12 of the Trademark Manual of Examining Procedure is incomplete in that excludes the following regarding the USPTO's burden to inquire of the applicant if the examining attorney believes an issue exits:

> Market realities and lack of laws concerning the registration of varietal and cultivar names have created a number of problems in this area.  Some varietal names are not attractive or easy to remember by the public.  As a result, many arbitrary terms are used as varietal names.  Problems arise when trademark registration is sought for varietal names, when arbitrary varietal names are thought of as being trademarks by the public, and when terms intended as trademarks by plant breeders become generic through public use.  These problems make this a difficult area for the examining attorney in terms of gathering credible evidence and knowing when to make refusals.

> Whenever an application is filed to register a mark containing wording for live plants,

20

1       agricultural seeds, fresh fruits, or fresh vegetables, the examining attorney must inquire
2       of the applicant whether the term has ever been used as a varietal name, and whether
     such name has been used in connection with a plant patent, a utility patent, or a
3       certificate for plant variety protection.

4  Trademark Manual of Examining Procedure, § 1202.12.

5       Gerawan explains that Prima was an established trademark for 18 years, and federally registered

6  for three years, prior to the first Prima-associated patent with a varietal name.  Gerawan notes that is uses

7  Prima for all its fruit, not merely fruit produced from threes covered by its five plant patents.  Gerawan

8  continues that a varietal name can be marketed with a trademark and that such trademark is not

9  necessarily part of the varietal denomination.  Gerawan points out that its varietal names are Diamond

10  19, Gattie, Black Plum 8-15, Black Plum 5-25, and Red Plum 9-1 and that its trademark is Prima.

11       This Court agrees with Gerawan that PBP has failed to establish that Gerawan's plant patents

12  render the Prima trademarks generic.  Of key importance is Prima's pre-existence to the patents.  The

13  record reveals that Gerawan has used Prima since the 1960s and the Prima work mark was registered

14  in 1987, no less than three years prior to the first patent filing.  PBP fails to demonstrate that the patents

15  cause consumers to associate Prima with fruits subject to the patents, rather than Gerawan, the fruit's

16  source.  The evidence raises inferences that patents are associated with Gerawan, not Prima.  PBP fails

17  to bridge a solid connection from the patents to Prima as a mere good, that is, fruits.  *See In re Stark*

18  *Bro's Nurseries & Orchards Co.*, 132 U.S.P.Q. 652, 653 (1962) ("It is, moreover, incongruous, to say

19  the least, to suppose that a single designation, such as "STARKRIMSON", would or could be used and

20  be considered in the trade or by the purchasing public as a varietal name for three distinctively different

21  types of plants and/or trees.")

22       In addition, Gerawan further validates existence of a dispute as to whether the public perceives

23  Prima as a brand of produce or as a generic plant varietal name in that:

24       1.     Gerawan uses the Prima trademarks for all its fruit, not merely fruit from plum, nectarine
25           and peach trees subject to the five plant patents;

26       2.     The Prima trademarks are used for grapes which are not covered by plant patents;

27       3.     Gerawan uses the Prima logo with federal registration symbol on its marketing materials
28           and boxes and labels, which is consistent with the produce industry; and

4.      Gerawan uses the Prima trademarks on a number of non-produce items, including boxes, buildings, website, labels, tags, recipe cards, pallets, clothing, headwear, pens, beverage containers, computer bags, paper tablet holder for sales and marketing, air pillows for shipping, fruit stickers, posters, business cards, <prima.com> email address, large retail store banners, letterhead, brochures, tissue paper, packing top sheets, trays, print advertisements, pallets and computer services.

At a minimum, factual issues exist whether the Prima trademarks are generic based on association with varietal names.

### Likelihood Of Confusion

PBP argues that Gerawan, is unable to establish "as a matter of law" confusion of the Prima and Prima Bella trademarks.

15 U.S.C. § 1125(a) provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any **word, term, name**, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

(A) is **likely to cause confusion**, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.  (Bold added.)

"A trademark's function is to identify and distinguish the goods or services of one seller from another." *General Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist,* 887 F.2d 228, 231 (9th Cir. 1989), *cert. denied*, 493 U.S. 1079, 110 S.Ct. 1134 (1990).  "The test of trademark infringement under state, federal, common law is whether there will be a likelihood of confusion." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1080 (9th Cir. 2005), *cert. denied*, 547 U.S. 1069 (2006).  "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." *Brookfield*

*Communications*, 174 F.3d at 1045.  "[U]nder the Lanham Act, 15 U.S.C. § 1125(a), the ultimate test is whether the public is likely to be deceived or confused by the similarity of the marks.  *New West Corp. v. NYM Co. of California, Inc.,* 595 F.2d 1194, 1201 (9ᵗʰ Cir. 1979).  "Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical is there a 'likelihood of confusion?'" *New West*, 595 F.2d at 1201.

The "Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another. . . . [T]rademark infringement protects only against mistaken purchasing decisions and not against confusion generally." *Lang v. Ret. Living Publ'g Co., Inc.*, 949 F.2d 576, 582-83 (2ⁿᵈ Cir.1991) (internal quotation marks and citation omitted).

The Ninth Circuit Court of Appeals employs an eight-factor test ("*Sleekcraft*" factors) to determine likelihood of confusion.  *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9ᵗʰ Cir. 2008); *Brookfield Communications,* 174 F.3d 1036, 1053-1054.  The factors are:

1. The mark's strength;

2. The goods' proximity or relatedness;

3. The marks' similarity;

4. Evidence of actual confusion;

5. Marketing channels used to sell respective goods;

6. Type of goods and degree of care likely to be exercised by purchaser;

7. Defendant's intent to select the mark; and

8. Likelihood of expansion of product lines.

*Jada Toys*, 518 F.3d at 632 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348, 349 (9ᵗʰ Cir. 1979)); *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9ᵗʰ Cir. 1998).

The likelihood of confusion test is "pliant" and "[s]ome factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Communications*, 174 F.3d at 1054.  The Ninth Circuit has "never countenanced a likelihood of confusion determination based on a consideration of dissimilarity alone or, indeed, on the consideration of any single factor." *Jada Toys*, 518 F.3d at 632.  The Ninth Circuit regularly applies "all relevant factors, noting that a final likelihood of confusion determination may rest on those factors that are of the

1   most relative importance in any particular case." *Jada Toys*, 518 F.3d at 632-633; *see Eclipse Assocs.*

2   *Ltd. v. Data General Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990) ("Our court has never articulated

3   specific factors that a district court must recite and apply, instead, we have identified a non-exclusive

4   series of factors that are helpful in making the ultimate factual determination.")

5          With these standards in mind, this Court turns to application of the *Sleekcraft* factors.

6                              ***Strength Of The Prima Trademarks***

7          PBP argues that Gerawan's Prima trademarks "are conceptually and commercially weak" and

8   that the Prima Bella trademarks are "not likely to cause any confusion with Gerawan's weak, generically-

9   eroded Prima mark." Gerawan responds that the Prima trademarks "are arbitrary as applied to fresh

10  produce and thus are extremely strong."

11         "The purpose of examining the strength of the plaintiff's mark is to determine the scope of

12  trademark protection to which the mark is entitled. . . .The more unique the mark, the greater the degree

13  of protection." *Surfvivor Media*, 406 F.3d at 631.  A strong mark is "afforded the widest ambit of

14  protection from infringing uses." *Sleekcraft*, 599 F.2d 349.   Trademarks are divided into categories, from

15  strongest to weakest, of arbitrary, fanciful, suggestive, descriptive and generic. *Surfvivor Media*, 406

16  F.3d at 631-632; *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

17         The two strongest sets of marks are "arbitrary" and "fanciful" marks, which trigger the highest

18  degree of trademark protection. *Surfvivor Media*, 406 F.3d at 631.  "Arbitrary" marks are common

19  words that have no connection with the actual product – for example, "Dutch Boy" paint. *Dreamwerks*

20  *Production*, 142 F.3d at  1130, n. 7. "Fanciful" marks consist of "coined phrases" that also have no

21  commonly known connection with the product at hand.  Examples of fanciful marks include "Kodak"

22  cameras or "Aveda" skin care products. *Surfvivor Media*, 406 F.3d at 632.

23         "Suggestive" marks do not "describe the product's features but suggest [ ] them."

24  *Kendall-Jackson Winery v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n. 8 (9th Cir.1998) (emphasis

25  omitted).  Imagination is required to associate a suggestive mark with the product. Examples include

26  "Slickcraft" boats or "Air Care," for a service that maintains medical equipment for administering

27  oxygen. *Surfvivor Media*, 406 F.3d at 632.

28         "Descriptive" marks define a particular characteristic of the product in a way that does not

24

require exercise of imagination. *Kendall-Jackson Winery*, 150 F.3d at 1047, n. 8. An example of a descriptive mark is "Honey Roasted" for nuts roasted with honey. *Surfvivor Media*, 406 F.3d at 632. Because these marks merely describe a characteristic of the product, they do not receive any trademark protection unless they acquire sufficient "secondary meaning" to create an association between the mark and the product. *Surfvivor Media*, 406 F.3d at 632.

"Generic" marks describe the product in its entirety and are not entitled to trademark protection. *Surfvivor Media*, 406 F.3d at 632. Examples include "Liquid controls" for equipment that dispenses liquid, or "Multistate Bar Examination" for a bar examination that may be taken across multiple states. *Surfvivor Media*, 406 F.3d at 632.; *see Nat'l Conf. of Bar Examiners v. Multistate Legal Stud., Inc.*, 692 F.2d 478, 488 (7th Cir.1983), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69 (1983).

A mark's strength is discussed or evaluated in terms of "conceptual" strength and "commercial" strength. Conceptual strength relates to the distinctiveness of the mark, for example whether the mark is "arbitrary or fanciful," or is "suggestive," or is merely "descriptive." *Playmakers, LLC v. ESPN, Inc.,* 297 F.Supp.2d 1277, 1281 (W.D. WA 2003). "A mark may also acquire strength through its use in the marketplace, otherwise known and commercial strength; this acquired strength can be shown through length and manner of use of the mark, the amount and volume of advertising, and the volume of sales." *Playmakers,* 297 F.Supp.2d at 1281. An "incontestable mark may be sufficiently strong for registration purposes, i.e. not 'generic,' but may still be relatively weak for likelihood of confusion purposes." *Playmakers,* 297 F.Supp.2d at 1281.

PBP argues that the Prima trademarks "are extraordinarily weak" in that "prima" is derived etymologically from the Latin word "primus" which means prime. PBP contends that "prima" "connotes 'first,' 'prime' or 'premier' goods or services with an international flavor." PBP notes that Gerwan's point-of-sale posters "pick up on this close etymological and alliterative connection by equating 'prima' and 'prime.'" PBP contends that the Prima Bella trademarks "are conceptually and commercially strong" in that they have "no meaning as it relates to corn produce" and the grocery produce industry recognizes Prima Bella as PBP's "brand name" given PBP's significant sales using the Prima Bella trademarks.

Gerawan responds that the Prima trademarks' strength is demonstrated by use of Prima for 40 years, significant sales of Prima branded products, consumer compliments and demand for Prima

25

products, Gerawan's use of a family of Prima marks on multiple products, and Gerawan's significant

share of stone fruit and grape markets.  Gerawan equates its use of "prima" for fresh fruits to the use

of "apple" for computers.  To address strength of the Prima trademarks, Gerawan criticizes PBP's

reliance on third-party "Prima" trademark registrations as irrelevant without evidence as to the third-

party trademarks' current use, history, subject goods or services, promotion, and consumer recognition

of them.  Gerawan further criticizes PBP's internet search results as pages "that may mention 'prima',

but do not show use of 'prima' as a trademark or the extent of that use by third parties."  Gerawan

concludes material factual issues exist regarding the strength of the Prima trademarks.

Contrary to PBP's claims, the record reveals that the Prima trademarks are strong and that at a

minimum, there are factual issues whether the Prima trademarks are arbitrary, at least in the produce

industry.  Food Lion's Mr. Scott confirmed the ready appearance of the Prima logo on Gerawan boxes

and stickers and customer requests for "Prima produce grown by the Gerawan name."  Fruit buyer Mr.

Weiler also confirmed that Prima is a major brand in the produce industry.  The commercial strength of

the Prima trademarks is further evidenced by Gerawan's significant stone fruit and grape sales over 40

years.  The strength of trademark factor weighs in Gerawan's favor.

### Proximity Or Relatedness

PBP contends that the proximity or relatedness of goods factor does not support likelihood of

confusion of the Prima and Prima Bella trademarks.

"When the goods produced by the alleged infringer compete for sales with those of the trademark

owner, infringement usually will be found if the marks are sufficiently similar that confusion can be

expected."  *Sleekcraft*, 599 F.2d at 348.  The "more closely related the goods are, the more likely

consumers will be confused by similar marks."  *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147

(9th Cir. 2002).  "Related goods are those products which would be reasonably thought by the buying

public to come from the same source if sold under the same mark."  *Sleekcraft*, 599 F.2d at 348, n. 10.

"In practice, this definition does not necessarily require a close proximity before goods will be found

related."  *Entrepreneur Media*, 279 F.3d at 1147.

The standard to decide whether goods are "related" is "whether customers are 'likely to associate'

the two product lines."  *Surfvivor*, 406 F.3d at 633.  In addressing the proximity/relatedness factor, a

1    court must "consider whether the buying public could reasonably conclude that the products came from

2    the same source." *Surfvivor*, 406 F.3d at 633.

3          "Proximity of the parties' goods exists where they are (1) complementary, (2) sold to the same

4    class of purchasers, or (3) are similar in use or function." *Matrix Motor Co., Inc. v. Toyota Jidosha*

5    *Kabushiki Kaisha*, 290 F.Supp.2d 1083, 1092 (C.D. Cal. 2003).  The mere fact that "two products or

6    services fall within the same general field . . . does not mean that the two products or services are

7    sufficiently similar to create a likelihood of confusion." *Harlem Wizards Entm't Basketball, Inc. v. NBA*

8    *Props.*, 952 F.Supp. 1084, 1095 (D.N.J.1997).  "Meaningful differences between the products and

9    services are often cited as a factor tending to negate reverse confusion, even when the products are

10   superficially within the same category." *Harlem Wizards Entm't Basketball*, 952 F.Supp. at 1095.

11         PBP argues that fruit and vegetable produce are not complementary and that commonality of

12   goods sold "in some of the same grocery stores and by some the same mass merchandising retailers does

13   not satisfy this factor."  PBP points to the deposition testimony of Food Lion's Mr. Scott that Food Lion

14   does not promote fruits and vegetables together as a tie in and that fruits and vegetables generally do not

15   appear in a single display. PBP notes its corn produce's distinguishable display in the refrigerated "wet

16   rack," "whereas Gerawan's fruit produce is typically displayed in boxes and with the grocery store

17   signage that refers to the produce emanating from 'California.'"

18         Gerawan contends that fruits and vegetables are related in that:

19         1.    Many companies market and sell fruits and vegetables under the same brand;

20         2.    Several companies own trademark registrations that are used and registered for fruits and

21               vegetables, including corn;

22         3.    Fruits and vegetables are frequently advertised together;

23         4.    Fruits and vegetables are sold in the same produce sections of retail outlets;

24         5.    Fruits and vegetables are exhibited in trade shows, often next to each other;

25         6.    Gerawan has grown fruits and vegetables; and

26         7.    Some of PBP's growers grow fruits and vegetables.

27   Gerawan concludes that fruits and vegetables are complementary and sold and used together.

28         There is no doubt that fruits and vegetables are sold collectively in produce sections of retail

27

1 outlets.  Food Lion's Mr. Scott noted that corn is not sold side by side with peaches, plums, nectarines

2 or grapes but rather within 20 feet of such fruits.

3       At a minimum, factual issues arise whether corn and stone fruit/grapes compete for sales among

4 the same class of customers.  A consumer may be faced with the choice of serving PBP's corn on the

5 cob or a fruit salad using Gerawan's stone fruit and grapes.  As such, a close relationship between PBP's

6 corn and Gerawan's stone fruit/grapes arises, or at least, a factual issue arises as to the degree of

7 closeness of their relationship.  The proximity of the parties' products in produce sections of grocery

8 stores suggests a relatedness of the products.  PBP offers nothing to suggest that purchasers of its corn

9 are in a class distinct from purchasers of Gerawan's stone fruit and grapes.  The proximity/relatedness

10 factor tips in Gerawan's favor.

11                            ***Similarity Of Marks***

12       PBP contends that Gerawan's Prima trademarks and PBP's Prima Bella trademarks are dissimilar

13 as they appear in the marketplace and regarding their respective sight, sound and meaning.

14       "The most important factor in any likelihood of confusion analysis is the similarity of the marks.

15 Without similarity, there can be no confusion."  *Playmakers*, 297 F.Supp.2d at 1282.  "Obviously, the

16 greater the similarity between the two marks at issue, the greater the likelihood of confusion."

17 *GoTo.com*, 202 F.3d at 1206.  The Ninth Circuit has developed "axioms" to guide the comparison: "1)

18 Marks must be considered in their entirety as they appear in the marketplace; 2) Similarity is adjudged

19 in terms of appearance, sound, and meaning; and, 3) Similarities weighed more heavily than

20 differences."  *GoTo.com*, 202 F.3d at 1206.  PBP quotes the following from 4 McCarthy on Trademarks

21 and Unfair Competition (4th ed. updated 2011), § 23:41: "[C]onflicting marks must be compared in their

22 entireties.  A mark should not be dissected or split up into its component parts and each part then

23 compared with corresponding parts of the conflicting mark to determine the likelihood of confusion.

24 It is the impression that the mark as a whole creates on the average reasonably prudent buyer and not the

25 parts thereof, that is important."

26       PBP argues that its Glori Ann word mark constitutes its "housemark" and must be analyzed in

27 that its is more prominently displayed on PBP's packaged, fresh sweet corn.  Emphasis on house marks

28 "has the potential to reduce or eliminate likelihood of confusion."  *Cohn v. Petsmart, Inc.*, 281 F.3d 837,

842 (9th Cir. 2002) (citation omitted).  PBP characterizes the Glori Ann word mark as "what the end-consumer sees and experiences in the real marketplace."

PBP contends that the Prima and Prima Bella trademarks are "quite dissimilar" given differences in their fonts, color schemes and ornamental features.  PBP notes that the "cotyledon[10] design of the Prima Bella logo evokes the tassel and leaves of corn stalk."  PBP points to the dissimilar sounding of Prima and Prima Bella given Prima's "two abrupt syllables" and Ms. Bacchetti's choice of Prima Bella because it flows "right of the tip of your tongue."  PBP distinguishes the meanings of Prima and Prima Bella in that Prima means "prime" and Prima Bella means "first beautiful" with "no specific meaning as applied to agricultural products."

Gerawan responds that the dominant portion of the Prima and Prima Bella trademarks "is the distinctive Prima element.  PBP's Prima Bella mark is only distinguishable for its use of the laudatory, descriptive term Bella, which does not serve to distinguish it from Plaintiff's Prima marks."  Gerawan continues that Prima Bella's different appearance on packaging "does not negate the likelihood of confusion, since consumers are likelier to remember the word itself than how it is depicted."  Gerawan contends that PBP's Glori Ann house mark does not absolve PBP of liability as the Glori Ann word mark is similar to Gerawan's Lor Ann mark which Gerawan had used until recently.[11]

There is no less than a factual issue whether Prima and Prima Bella are similar in sight and sound.  Prima and Prima Bella clearly share "Prima," with the addition of "Bella" as the only distinction.  Although the Prima and Prima Bella logos use different fonts and styles, they share "Prima" to raise a factual issue as to similarity.  However, Gerawan fails to raise factual issues as the similarity of the Glori Ann word mark.  Gerawan merely offers that until recently, it has used Lor Ann but offers nothing to place such mark in the produce context.  Gerawan's acknowledgment that it ceased using Lor Ann more

/ / /

/ / /

/ / /

_____

[10]     PBP explains that cotyledon is defined as a "leaf of the embryo of a seed plant, which upon germination either remains in the seed or emerges, enlarges and becomes green."

[11]     PBP notes that Gerawan has not used Lor Ann for two years.

than two years ago demonstrates the lack of relevance of the Lor Ann mark.[12]  Based strictly on factual issues surrounding the Prima and Prima Bella trademarks, the similarity factor weighs in Gerawan's favor.

### *Actual Confusion*

PBP challenges Gerawan's ability to demonstrate actual consumer confusion between the Prima and Prima Bella trademarks.

"Evidence of actual confusion by consumers is strong evidence of likelihood of confusion." *Surfvivor*, 406 F.3d at 633.  In addressing actual confusion, a court "may consider whether merchants and non-purchasing members of the public, as well as actual consumers, were confused." *Surfvivor*, 406 F.3d at 633.  "Proving actual confusion is difficult, however . . . and the courts have often discounted such evidence because it was unclear or insubstantial." *Sleekcraft*, 599 F.2d at 352.  "Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.  However, "actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act." *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir.1991) (citing *American Int'l Group, Inc. v. American Int'l Bank*, 926 F.2d 829, 832 (9th Cir.1991)).

PBP argues that no evidence of actual consumer confusion has emerged "despite the presence of the parties' respective fruit and vegetable produce in the marketplace since early 2002."  PBP points to the absence Gerawan's "survey evidence to support its claim" and the passage of time since Gerawan and PBP's products became available in the marketplace.  "We cannot think of more persuasive evidence that there is no likelihood of confusion between these two marks than the fact that they have been simultaneously used for five years without causing any consumers to be confused as to who makes what." *Brookfield Communications*, 174 F.3d at 1050.  PBP further notes there is no direct evidence of actual confusion, such as, misdirected letters or telephone calls or inquiries whether PBP and Gerawan are associated.

---

[12]    This Court's comments on the Glori Ann and Lor Ann marks are restricted to the similarity of marks factor in the *Sleekcraft* analysis.  PBP did not seek summary adjudication as to the Glori Ann or Lor Ann marks, and the Lor Ann mark does not appear subject to the FAC's claims and thus is irrelevant.

1    As to confusion, Gerawan points to the declaration of Food Lion's Mr. Scott: "The first time I

2  heard of Prima Bella Produce in connection with produce, I immediately thought of Gerawan's Prima

3  produce and wondered if the two were related in some manner." "Likelihood of confusion will be found

4  whenever consumers are likely to assume that a mark is associated with another source or sponsor

5  because of similarities between the two marks." *Academy of Motion Picture Arts & Sciences*, 944 F.2d

6  at 1456.  Gerawan concludes that the actual confusion factor "is neutral" to the parties.

7    Gerawan appears to concede the absence of evidence of actual confusion.  Gerawan merely relies

8  on Mr. Scott's association of Prima Bella with Gerawan.  PBP astutely notes the co-existence of Prima

9  and Prima Bella trademarks in the produce market since 2002 and the absence of survey evidence and

10  misdirected communications and inquiries.  There is no evidence to suggest actual confusion between

11  the Prima and Prima Bella trademarks.  The actual confusion element weighs in PBP's favor.

12                            ***Martketing Channels***

13    PBP contends that its and Gerawan's "marketing channels do not meaningfully converge or

14  create any likelihood of confusion" in that Gerawan offers seasonal fruit that "generally occupies much

15  different shelf space."

16    A court "must determine whether the parties distribute their goods in the same marketing

17  channels."  *Surfvivor*, 406 F.3d at 633.  "Convergent marketing channels increase the likelihood of

18  confusion."  *Sleekcraft*, 599 F.2d at 353.

19    PBP urges this Court to concentrate on the parties' marketings.  PBP notes that Gerawan's

20  marketing for its seasonal fruits differs from PBP's marketing for its corn products which "are available

21  all year."  PBP points to Gerawan's marketing emphasis on "California" fruit and that Gerawan's

22  "website and promotional materials do not mention any farming or sales of vegetable produce."  PBP

23  further points to Gerawan's spending "relatively little money on product advertising."

24    Gerawan notes that Gerawan's and PBP's produce products are sold in identical or related retail

25  outlets and that Gerawan and PBP share 17 customers.

26    PBP's corn and Gerawan's stone fruit and grapes share similar market channels, that is, produce

27  sections of retail outlets.  The record reveals that PBP's and Gerawan's products are sold in close

28  physical proximity.  Their marketing channels converge, and this factor weighs in Gerawan's favor.

1

*Customer Care*

2      PBP argues that grocery store customers will exercise ordinary care to purchase fresh vegetable

3 and fruit produce to negate likelihood of confusion between the Prima and Prima Bella trademarks.

4      "In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods,

5 the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the

6 two product lines." *Surfvivor*, 406 F.3d at 634.  "[W]hen dealing with inexpensive products, customers

7 are likely to exercise less care, thus making confusion more likely." *Resource Lenders, Inc. v. Source*

8 *Solutions, Inc.*, 404 F.Supp.2d 1232, 1245 (E.D. Cal. 2005).

9      PBP points to the deposition testimony of Food Lion fruit category manager Mr. Scott that

10 grocery produce customers are sophisticated and "should probably get a little more credit than we give

11 them. . . . I think they're looking at the fruit as a piece of fruit.  Does it have good color?  Is it a good

12 size?  Is it not bruised?  Is it not leaking?  Does it have stem punctures? I think that's what they're

13 looking at."  PBP notes that typical customers purchase PBP's packaged corn with "distinctive Glori

14 Ann house mark logo and the Prima Bella trademarks" and know "they are purchasing corn."

15      Gerawan argues that since the Gerawan's and PBP's products are inexpensive, their customers

16 are not sophisticated.

17      The parties offer no meaningful evidence regarding sophistication of produce buyers.  Mr. Scott

18 suggests that produce customers are discerning, and Gerawan does not dispute such suggestion.

19 Nonetheless, produce is relatively inexpensive and does not require sophistication to evaluate.  The

20 customer care and sophistication factor is neutral to the parties.

21

*PBP's Intent*

22      PBP argues that it had no intent to deceive the public with the Prima Bella trademarks and that

23 Gerawan fails to challenge Mr and Ms. Bacchetti's testimony "regarding how they chose their Prima

24 Bella Produce tradename."

25      Although "an intent to confuse consumers is not required for a finding of trademark

26 infringement," *Brookfield Communications*, 174 F.3d at 1059, "intent to deceive is strong evidence of

27 a likelihood of confusion," *Interstellar Starship Services, Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir.

28 1999).  "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts

presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354.  The issue "is not that an intent to confuse is relevant as some measure of culpability.  Rather, the alleged infringer's judgment as to what is likely to be confusing is relevant because it may well be accurate." *Entrepreneur Media*, 279 F.3d at 1148.  "Where an alleged infringer chooses a mark he knows to be similar to another, one can infer an intent to confuse." *Entrepreneur Media*, 279 F.3d at 1148.

PBP contends it adopted its Prima Bella trademarks in good faith and that Gerawan is unable to establish PBP's bad faith to adopt the Prima Bella trademarks.  PBP notes that Ms. Bacchetti chose Prima Bella to add to the pre-existing Bella name that had served as a trademark and root for other related company tradenames.  PBP points out that it obtained USPTO trademark registration for the Prima Bella trademarks without USPTO trademark examiner mention of an impediment raised by Gerawan's Prima trademarks.

Gerawan faults PBP's failure "to perform a trademark search or consult a trademark lawyer" to unveil "Gerawan's federal trademark registrations for some of the Prima marks."  Gerawan claims that PBP had "actual and constructive notice" of the Prima trademarks.

Gerawan points to no meaningful evidence that PBP intended to deceive produce buyers and to trade on Gerawan's goodwill.  For the Prima Bella choice, Ms. Bacchetti offers a logical explanation free of bad intent.  Ms. Bacchetti consulted an outside accountant who informed her that Prima Bella was not used as a California corporate name.  In the absence of evidence to suggest that PBP choose Prima Bella to create confusion with Prima, the intent factor weighs in PBP's favor.

### *Product Lines Expansion*

PBP argues that Gerawan has "produced no tangible plans showing a strong possibility of expanding into growing and selling fresh vegetable produce."

The likelihood of expansion factor addresses "whether existence of the allegedly infringing mark is hindering the plaintiff's expansion plans." *Surfvivor*, 406 F.3d at 634.  "A 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354.

PBP contends that "Gerawan produced no credible evidence of any tangible plan to grow and sell

1  fresh vegetable produce."

2        Gerawan notes that it previously sold vegetables under the Prima trademarks and that Ray

3  Gerawan had recent discussions with Gerawan's general ranch manager to produce cauliflower and

4  broccoli.

5        Gerawan points to no concrete plans to expand into vegetable production.  Of key importance,

6  Gerawan has no apparent plans to produce corn.  As such, the product lines expansion factor weighs in

7  PBP's favor.

8        An analysis of the *Sleekcraft* factors raises no less than factual issues to defeat summary

9  judgment on the likelihood of confusion issue.  Given the disfavor of summary judgment in trademark

10  infringement actions and factual issues noted above, this Court is not in a position to grant PBP summary

11  judgment on the issue of likelihood of confusion.

12              **Priority Rights For Fresh Vegetable Produce**

13        PBP argues that Gerawan is barred to claim priority rights for its Prima trademarks for fresh

14  vegetables because Gerawan ceased using its Prima trademarks for fresh vegetable produce no later than

15  1980.  According to PBP, Gerawan misled the USPTO and public that Gerawan used the Prima

16  trademarks for "vegetable produce when it was not."

17        PBP notes that under 15 U.S.C. § 1115(b), after filing an affidavit of continuous mark use for

18  five years "for those good or services stated in the registration" pursuant to 15 U.S.C. § 1065, the

19  trademark becomes incontestible.  Prior to such time, the U.S. trademark registration is "prima facie

20  evidence" of the registrant's exclusive right to use the registered trademark "in connection with the

21  goods or services specified in the registration . . ."  15 U.S.C. § 1115(a).

22        Gerawan's Prima word mark issued in 1987 to include a number of fresh vegetables. PBP argues

23  that when Gerawan applied for its Prima word mark in 1985, "it had already ceased using the Prima

24  work mark for fresh vegetable produce" and "could not truthfully aver that it was presently using the

25  mark in connection with fresh vegetable produce" when it applied for the Prima word mark. PBP points

26  to Dan Gerawan's acknowledgment in his deposition that Gerawan had "been out of vegetables" for 30

27  years and that a 1993 affidavit of use was incorrect as to vegetables.  15 U.S.C. § 1127 addresses

28  trademark abandonment and provides: "Nonuse for 3 consecutive years shall be prima facie evidence

1  of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of

2  trade, and not made merely to reserve a right in a mark."

3      Based on Gerawan's abandonment of the Prima word mark as to vegetables, PBP contends that

4  it is the "senior user with priority rights for use of its Prima Bella trademarks in connection with fresh

5  vegetable produce."  PBP continues that "[b]ased on equitable principles of equitable estoppel, unclean

6  hands, laches, and trademark misuse, Gerawan cannot claim a priority entitlement vis-a-vis Prima Bella

7  regarding product expansion rights in the fresh vegetable category."

8      Gerawan responds that PBP offers "a non-sensical hodgepodge of legal principals related to

9  trademark law, supplemented with an undefined 'combination' of other trademark-related doctrines on

10  which PBP will bear the burden at trial."  Gerawan argues that PBP's selling of vegetables and

11  Gerawan's primary fruit sales do not entitle PBP to priority over Gerawan as to vegetables in that the

12  parties' respective goods are related.

13      Gerawan characterizes the "essence" of PBP's claims as "fraudulent procurement" in that, using

14  Gerawan's words, "Gerawan made fraudulent statements to the USPTO by claiming use of the Prima

15  word mark for 'fresh vegetables' when Gerawan had already ceased such use."  "A party may seek

16  cancellation of a registered trademark on the basis of fraud under 15 U.S.C. § 1064(c) by proving a false

17  representation regarding a material fact, the registrant's knowledge or belief that the representation is

18  false, the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and

19  damages proximately resulting from the reliance." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th

20  Cir. 1990).  "Fraud in procurement of a trademark registration may be raised as a ground for cancellation

21  in civil litigation, in which case it may function as a 'defense' to a claim of trademark infringement."

22  *eCash Techs., Inc. v. Guagliardo*, 127 F.Supp.2d 1069, 1079 (C.D. Cal. 2000). "The defense is

23  disfavored, however, and carries a heavy burden of proof." *Hana Financial, Inc. v. Hana Bank*, 500

24  F.Supp.2d 1228, 1233-1234 (C.D. Cal. 2007) (citing *Robi*, 918 F.2d at 1444). Gerawan concludes that

25  deleting vegetables from its trademark registration was not nefarious.

26      This Court agrees with Gerawan that there is an absence of evidence of fraud to support PBP's

27  priority theory.  Gerawan's inclusion of vegetables in its trademark registration was inaccurate but

28  nothing suggests that such inclusion satisfies elements of fraudulent procurement.  PBP's claims of

1  priority appear at best as a distraction.

2  **<u>Likelihood Of Dilution</u>**

3  PBP challenges Gerawan's ability to demonstrate a likelihood of dilution of the Prima trademarks

4  because the Prima trademarks are not famous to render them subject to dilution.

5  Dilution refers to the diminution of a trademark's value when it is used to identify different

6  products. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002), *cert. denied*, 537 U.S.

7  1171 (2003). Dilution protects owners "from an appropriation of or free riding on" the substantial

8  investment that they have made in their marks. *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 50

9  (1st Cir.1998). In *Mattel*, 296 F.3d at 903, the Ninth Circuit explained:

10  For example, Tylenol snowboards, Netscape sex shops and Harry Potter dry cleaners
    would all weaken the "commercial magnetism" of these marks and diminish their ability
11  to evoke their original associations. Ralph S. Brown, Jr., *Advertising and the Public
    Interest: Legal Protection of Trade Symbols*, 57 Yale L.J. 1165, 1187 (1948), reprinted
12  in 108 Yale L.J. 1619 (1999). These uses dilute the selling power of these trademarks by
    blurring their "uniqueness and singularity," Frank I. Schechter, *The Rational Basis of
13  Trademark Protection, 40 Harv. L.Rev. 813, 831* (1927), and/or by tarnishing them with
    negative associations.

14

15  With the enactment of the Federal Trademark Dilution Act in 1996, the Lanham Act expanded

16  to permit famous mark owners to obtain injunctive relief against another's commercial use of the mark

17  in commerce. *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005). The statute

18  protects "the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness,

19  . . . against another person who, at any time after the owner's mark has become famous, commences use

20  of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by

21  tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of

22  competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1).

23  "Although this statutory language is ungainly, its meaning seems clear: It refers to a use of a

24  famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner."

25  *Mattel*, 296 F.3d at 903. "Protection of trade dress, no less than of trademarks, serves the Act's purpose

26  to 'secure to the owner of the mark the goodwill of his business and to protect the ability of consumers

27  to distinguish among competing producers.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774,

28  112 S.Ct. 2753 (1992) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198, 105

36

S.Ct. 658 (1985)).  In contrast to other trademark protections, dilution "does not require a showing of consumer confusion" in that "dilution law protects only the distinctiveness of the mark, which is inherently less weighty than the dual interest of protecting trademark owners and avoiding harm to consumers that is at the heart of every trademark claim." *Mattel*, 296 F.3d at 905.

### Dilution Elements

To prove a dilution claim, "a plaintiff must show that (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys*, 518 F.3d at 634.  The analysis is the same under federal and California law. *Jada Toys*, 518 F.3d at 634.

### Famous And Distinctive

Dilution is reserved "for a select class of marks – those with such powerful consumer associations that even non-competing uses can impinge on their value." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir.1999).  "[T]o meet the famousness element of protection under the dilution statutes a mark must be truly prominent and renowned." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 46 (1st Cir.1998).   "In short, for purposes of § 1125(c), a mark usually will achieve broad-based fame only if a large portion of the general consuming public recognizes that mark. Put another way, as a district court recently did, the mark must be a household name." *Thane Intern., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002).

15 U.S.C. § 1125(c)(2)(A) specifies factors to address a mark's fame:

> In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii) The extent of actual recognition of the mark.
>
> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register."

PBP challenges Gerawan's ability to "demonstrate that its Prima marks are 'widely recognized

by the general consuming public . . .'" PBP argues that Prima is not a household name.  PBP points to the testimony of Food Lion's Mr. Scott and the Prima brand does fit into the category of Chiquita bananas, Del Monte pineapples, Dole bananas, Dole Salads or Fress Express salads.

PBP faults Gerawan's failure to produce a consumer survey to demonstrate "the alleged fame of its Prima marks."  PBP points to Ray Gerawan's testimony that he does not know whether the Prima brand is widely recognized by the general consuming public in California or any area of California.  PBP attributes Gerawan to spend "a relatively modest amount of money on product advertising" in that it does not engage in "television or radio or many other forms of publicity."  PBP notes its points raised in connection with likelihood of confusion as to dissimilarity between the Prima and Prima Bella trademarks, weakness and lack of recognition of the Prima trademarks, passing of the Prima trademarks in the public domain as generic fruit variety designations, absence of association of the Prima and Prima Bella trademarks, and lack of PBP's intent to create an association with the Prima trademarks.

Gerawan attributes PBP to rely "on a number of conclusory allegations to support its claim that Gerawan's Prima marks are not famous."  Gerawan argues "there is sufficient information from which a jury could reasonably conclude that Gerawan's Prima marks are famous."  "Whether a defendant's mark creates a likelihood of dilution is a factual question generally not appropriate for decision on summary judgment."  *Visa Intern. Service Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010).

The record reveals factual issues as to the fame of the Prima trademarks.  Gerawan aggressively uses the Prima trademarks in connection with its products.  Gerawan uses its Prima trademarks on its boxes, buildings, website, labels, tags, recipe cards, pallets, clothing, headwear, pens, beverage containers, computer bags, paper tablet holder for sales and marketing, air pillows for shipping, fruit stickers, posters, business cards, <prima.com> email address, large retail store banners, letterhead, brochures, tissue paper, packing top sheets, trays, print advertisements, pallets and computer services. Food Lion's Mr. Scott testified as to the appearance of "Prima . . . on the side of their boxes" and declared that several customers have asked for "Prima produce grown by the Gerawan name."  New York fruit buyer Mr. Weiler recognized Prima as a major brand in the produce industry and testified that his customers ask "for the Prima brand of that commodity, grape, peach, nectarine."  Although the Prima trademarks may lack the fame of Dole, Del Monte or Sunkist, Gerawan has raised factual issues as to

1   the famous and distinctive element of trademark dilution.  Moreover, of critical importance, PBP has

2   failed to produce evidence to negate the fame of Prima or to show that Gerawan lacks evidence of the

3   fame of the Prima trademarks.

4   / / /

5                                   ***Likely To Cause Dilution***

6          Gerawan argues that the Prima and Prima Bella trademarks are so similar "that a likelihood of

7   dilution can be inferred."  "[W]hen identical marks are used on similar goods, dilution – the capacity of

8   the famous mark to identify and distinguish the goods of the trademark holder – obviously occurs."

9   *American Honda Motor Co., Inc. v. Pro-Line Protoform*, 325 F.Supp.2d 1081, 1085 (C.D. Cal. 2004).

10  "[A]ctual dilution can reliably be proved through circumstantial evidence . . . where the junior and senior

11  marks are identical."  *Moselay v. V Secret Catalogue, Inc.*, 537 U.S. 418, 433, 123 S.Ct. 1115 (2003).

12  "Assessing whether marks are identical is a fact-based determination."  *Horphag Research Ltd. v.*

13  *Garcia,* 475 F.3d 1029, 1036 (9th Cir. 2007).

14         Gerawan challenges PBP's ability to demonstrate an absence of blurring of the Prima and Prima

15  Bella trademarks.  "Where, as here, a plaintiff's claim is based on a dilution by blurring theory, the

16  question is whether the 'association arising from the similarity between a mark or trade name and a

17  famous mark . . . impairs the distinctiveness of the famous mark."  *Jada Toys*, 518 F.3d at 635 (quoting

18  15 U.S.C. § 1125(c)(2)(B)).  A court may consider all relevant factors in making this determination,

19  including the six identified by 15 U.S.C. § 1125(c)(2)(B):

20         (i) The degree of similarity between the mark or trade name and the famous mark.

21         (ii) The degree of inherent or acquired distinctiveness of the famous mark.

22         (iii) The extent to which the owner of the famous mark is engaging in substantially
            exclusive use of the mark.
23
            (iv) The degree of recognition of the famous mark.
24
            (v) Whether the user of the mark or trade name intended to create an association with the
25          famous mark.

26         (vi) Any actual association between the mark or trade name and the famous mark.

27         Similar to the likelihood of confusion issue, factual issues arise as to the likelihood of dilution

28  given the similarity between the Prima and Prima Bella trademarks.  PBP has failed to provide

                                                  39

meaningful evidence to negate potential for blurring of the Prima and Prima Bella trademarks, especially given that such task is fact based.  PBP's reliance on points raised to address likelihood of confusion fare no better as to likelihood of dilution.   Factual issues preclude summary judgment on Gerawan's trademark dilution claims.

<u>**CONCLUSION AND ORDER**</u>

For the reasons discussed above, this Court:

1.        DENIES PBP summary judgment; and

2.        RECONFIRMS the September 20, 2011 pretrial conference and November 7, 2011 trial.

IT IS SO ORDERED.

**Dated:**     **August 2, 2011**                               /s/ Lawrence J. O'Neill
                                                          UNITED STATES DISTRICT JUDGE